Kiley L. Grombacher
Bradley Grombacher, LLP
31365 Oak Crest Drive, Suite 240
Westlake Village, CA 91361
Kgrombacher@bradleygrombacher.com
Telephone: 805-270-7100
Facsimile: 805-270-7589

Daniel J. Thornburgh, Esq. AYLSTOCK, WITKIN, KREIS
& OVERHOLTZ, PLC
17 East Main Street, Suite 200
Pensacola, FL 32502
Telephone: 850-202-1010
Fax: 850-916-7449
dthornburgh@awkolaw.com

*Counsel for Plaintiff, Seyed Majid Sadegi*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **SEYED MAJID SADEGI**<br><br>Plaintiffs,<br><br>v.<br><br>**TOPBET TECH CORP. (FORMERLY DOING BUSINESS AS ITECHNO SPECIALIST INC.), PAWEENA CHAIWICHA, NATTARIGA SAE-POO, SAVIKAH THIPPAYAKATHA, LUCY LOU and JOHN DOE DEFENDANTS 1-5 WHO ARE THE CO-CONSPIRATORS OF TOPBET TECH CORP.**<br><br>Defendants. | **Case No. 2:24-cv-06628-MWC-SK**<br><br><br>**PLAINTIFF'S FIRST AMENDED COMPLAINT FOR VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")** |

Plaintiff, SEYED MAJID SADEGI, by and through undersigned counsel, sues TOPBET TECH CORP., formerly doing business as ITECHNO Specialist Inc. (referred to hereinafter as "TOPBET TECH"), its employees PAWEENA CHAIWICHA, NATTARIGA SAE-POO, SAVIKAH TIPPAYAKATHA, and LUCY LOU, and JOHN DOE DEFENDANTS 1-5 who are the co-conspirators of TOPBET TECH [1] as follows:

**PRELIMINARY STATEMENT**

1. This action arises from a sophisticated international cryptocurrency fraud and money laundering scheme, commonly referred to as a "pig butchering" scam, which resulted in the theft of Plaintiff Seyed Majid Sadegi's digital assets. Upon information and belief, the scheme was perpetrated by the above-referenced employees of TOPBET TECH, at its direction, and a network of criminal organizations operating through a complex web of cryptocurrency wallets and exchanges.

2. Recent investigations by the United States, as detailed in a Verified Complaint for Forfeiture *In Rem* filed in the United States District Court for the District of Columbia (Case No. 1:25-cv-01907), have traced the proceeds of cryptocurrency confidence scams through a network of at least 144 OKX exchange accounts and hundreds of intermediary wallets. The DOJ's action resulted in the seizure of

---

[1] Plaintiff is engaged in confidential settlement negotiations with one of the co-conspirators of TOPBET TECH, in coordination with the United States Government. Plaintiff reserves the right to amend this lawsuit to add this Doe Defendant should the settlement negotiations reach an impasse.

approximately 225,364,961 USDT held in seven wallets on the OKX platform.

3. Plaintiff's blockchain tracing confirms that Plaintiff Sadegi's stolen cryptocurrency was laundered through 29 wallets that were also identified in the government's Verified Complaint or its exhibits. In other words, the wallets used to steal Plaintiff's cryptocurrency are part of the same money laundering network targeted by the government's forfeiture action.

4. The government identified ITECHNO Specialist Inc. ("ITECHNO") as a key participant in the scam and laundering operation. Specifically, ITECHNO is alleged to have operated out of a scam compound in the Philippines, and in some cases, employed forced labor to perpetrate cryptocurrency confidence scams and launder victim funds.

5. Upon information and belief, ITECHNO continues to operate in the same building on the same two floors, located in metro-Manilla, Philippines; but in an attempt to avoid detection while continuing its scam operation, ITECHNO changed its name to TOPBET TECH CORP ("TOPBET TECH"). *See* Exhibit A, Declaration of Michael Nasca.

6. Plaintiff brings this amended action to add TOPBET TECH, its employees who have been identified through third-party discovery, and its co-conspirators Doe Defendants 1-5, based on their demonstrable involvement in the theft and laundering of Plaintiff's assets as established by the Government and Plaintiff's forensic tracing.

7. Defendants stole various cryptocurrency from Plaintiff, including 194,794

3

USD Coin (USDC), 113,958.21 Tether and (USDT), and 2.54754 Ethereum (ETH), pursuant to a sophisticated global internet cryptocurrency fraud and conversion scheme.[2]

8.    TOPBET TECH, along with its employees, played a material role in the theft of Plaintiff's assets. They and their co-conspirators currently possess all, or a significant portion, of Plaintiff's stolen property.

9.    Plaintiff brings this lawsuit to recover his stolen assets.

### SUBJECT MATTER JURISDICTION AND VENUE

10.    This is an action for damages related to the theft of Plaintiff's cryptocurrency assets as detailed below. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (diversity jurisdiction) as Plaintiff is a citizen of California and the Defendants are citizens of foreign nations. This action includes damages pursuant to 18 U.S.C. § 1964 (the "Racketeer Influenced and Corrupt Organizations Act" or "RICO"). This Court, further, has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question).

11.    Venue is proper in this District pursuant to 18 U.S.C. § 1965(a) and (b), and 28 U.S.C. § 1391(b) and (c).

12.    Defendants are subject to personal jurisdiction in this district, because they

---

[2] Tether (USDT) belongs to a subset of digital assets called stablecoins. Stablecoins are anchored or "pegged" to less-volatile assets. In the case of USDT, it is pegged to the U.S. Dollar. Thus, 1 USDT equals approximately $1 USD.

direct business activities toward, and conduct business with, consumer throughout the United States, including within the State of California and this district through at least a fraudulent website (BankCEX) which, during the relevant period of time, could be accessed on the internet and on smartphones and are accessible from California.

13.    As detailed more fully in below and incorporated herein, Plaintiff accessed the fraudulent website (BankCEX) in the State of California and the theft occurred while Plaintiff was located in the State of California.  Defendants directed numerous false and fraudulent representations to Plaintiff in this district, stole Plaintiff's assets within this district, and caused significant harm to Plaintiff in this district.

**THE PARTIES AND PERSONAL JURISDICTION**

14.    Plaintiff, SEYED MAJID SADEGI, an individual, is *sui juris*, and is a resident and citizen of California.

15.    Defendant TOPBET TECH CORP., formerly doing business as ITECHNO Specialist Inc., is an entity that operates out of a scam call center compound, sometimes using human trafficked victims, that has perpetrated cryptocurrency confidence scams (a/k/a "Pig Butchering scams") out of the scam call center located on the 7th and 10th floors of the Aseana One building in metro-Manila, Philippines.

16.    Defendant Paweena Chaiwicha, a citizen of Thailand, an individual, is *sui juris*, an employee of TOPBET TECH who, along with her cohorts, perpetrated the scam against Plaintiff and helped launder his stolen assets to wallets owned or controlled by the criminal enterprise. Defendant Chaiwicha is subject to the personal

5

jurisdiction of this Court. It is unknown at this time if Defendant Chaiwicha voluntarily scammed the Plaintiff or if she was trafficked and forced to perpetrate scams against U.S. Citizens, including against Plaintiff.

17. Defendant Nattariga Sae-poo, a citizen of Thailand, is *sui juris,* an individual believed to be an employee of TOPBET TECH or its predecessor company, ITECHNO. Defendant Sae-poo, along with her cohorts, perpetrated the scam against Plaintiff and helped launder his stolen assets to wallets owned or controlled by the criminal enterprise. Defendant Sea-poo is subject to the personal jurisdiction of this Court. It is unknown at this time if Defendant Sea-poo voluntarily scammed the Plaintiff or if she was trafficked and forced to perpetrate scams against U.S. Citizens, including against Plaintiff.

18. Defendant Savikah Thippayakatha, a citizen of Thailand, is *sui juris*, an individual believed to be an employee of TOPBET TECH or its predecessor company ITECHNO. Defendant Thippayakatha, along with her cohorts, perpetrated the scam against Plaintiff and helped launder his stolen assets to wallets owned or controlled by the criminal enterprise. Defendant Thippayakatha is subject to the personal jurisdiction of this court. It is unknown at this time if Defendant Thippayakatha voluntarily scammed the Plaintiff or if she was trafficked and forced to perpetrate scams against U.S. Citizens, including against Plaintiff.

19. Defendant Lucy Luo, a citizen of Hong Kong, is *sui juris*, an individual believed to be an employee of TOPBET TECH or its predecessor company ITECHNO.

6

Defendant Luo, along with her cohorts, perpetrated the scam against Plaintiff and helped launder his stolen assets to wallets owned or controlled by the criminal enterprise. Defendant Luo is subject to the personal jurisdiction of this court. It is unknown at this time if Defendant Luo voluntarily scammed the Plaintiff or if she was trafficked and forced to perpetrate scams against U.S. Citizens, including against Plaintiff. (Defendants Chaiwicha, Sae-poo, Thippayakatha and Luo are referred to hereinafter collectively as "Defendant Employees").

20.    DOE DEFENDANTS 1-5, are *sui juris*, and subject to the personal jurisdiction of this Court. DOE DEFENDANTS 1-5 have not only intentionally concealed their identities as part of their scheme to defraud Plaintiff, but as part of their conspiracy, directed fraudulent communications towards Plaintiff in California, causing Plaintiff to suffer significant economic and emotional harm while in California.

21.    Upon information and belief, Doe Defendants 1-5 are the co-conspirators of TOPBET TECH who helped launder the stolen assets to wallet addresses owned and controlled by the criminal enterprise, including to a Philippine Offshore Gaming Operator ("POGO") where a portion of Plaintiff's assets were deposited.

22.    To lend legitimacy to the fraudulent scheme, and cultivate the appearance of a lawful, regulated trading platform, Defendants—acting through employees and agents of TOPBET TECH—affirmatively required Plaintiff to complete a purported "Know Your Customer" ("KYC") verification process as a condition of continued participation. This process required Plaintiff to transmit highly sensitive,

jurisdiction-specific, personal identifying information, including uploading a copy of his California driver's license and providing additional information expressly confirming his status as a resident and citizen of California. Defendants reviewed, accepted, and relied upon this information to permit Plaintiff to continue transacting on the platform.

23. Through this KYC process, as well as through ongoing communications directed to Plaintiff, Defendants had actual knowledge that Plaintiff resided in California and nonetheless continued to solicit, direct, and facilitate fraudulent transactions with him while he was located in California. Defendants' conduct was therefore expressly aimed at California, and the harm caused was both suffered in, and directed toward, this forum.

24. Defendants' purposeful contacts with California were neither isolated nor accidental. On information and belief, Defendants imposed the same purported KYC requirements on hundreds of other victims who, like Plaintiff, were California residents. Each were required to submit the California-issued identification and residency information as part of Defendants' scheme. Defendants thus knowingly and systematically targeted California residents, repeatedly extracting funds from such individuals while leveraging California-specific identifying information to perpetuate the fraud.

25. Under these circumstances, Defendants intentionally and repeatedly directed tortious conduct toward California residents, including Plaintiff, with full

knowledge that the brunt of the injury would be felt in California. Defendants' contacts with this forum are therefore substantial, deliberate, and directly give rise to the claims asserted herein, such that the exercise of personal jurisdiction over Defendants in California comports with due process. At all times material hereto, Defendants have maintained and continue to maintain private cryptocurrency wallets and cryptocurrency exchange accounts in which all, or a portion of, Plaintiff's stolen cryptocurrency currently sits.

## ALLEGATIONS COMMON TO ALL COUNTS

A.  Defendants Executed an International Cryptocurrency Theft Scheme

26.    Plaintiff is a victim of not only a nationwide, but also a worldwide RICO conspiracy known as "pig butchering."

27.    Pig butchering scams are "fraudulent crypto investment schemes directed from Asia," which are now a billion-dollar industry.[3]

28.    Pig butchering scams run and perpetrated by organized criminal groups in Southeast Asia are called such because the victims are "likened to hogs fattened up for slaughter." [4]

29.    The scammers, typically located in Southeast Asia, carefully research their victims and often spend months grooming the victim to gain the victim's trust.

---

[3] https://www.reuters.com/investigates/special-report/fintech-crypto-fraud-thailand/
[4] https://www.nbcnews.com/news/crime-courts/pig-butchering-scams-rise-fbi-moves-stop-bleeding-rcna137009

30.     Pig butchering scammers utilize expertly crafted copycat websites that replicate authentic trading platforms. These scammers simulate trades and returns while the victims are unaware of the scheme.[5]

31.     Around September 2022, Plaintiff received a phone call from an individual named "Anna" who claimed that she was calling for a different individual but continued to converse with Plaintiff.[6] Anna initially communicated with Plaintiff via text messages with a phone number of +1 (323) 220-8740 then later through WhatsApp with a WhatsApp number of +1 (323) 300 2897 (VoIP).

32.     Within a few days of meeting, Anna misrepresented that she would help Plaintiff pay off his debt by teaching Plaintiff how to become a successful cryptocurrency trader.

33.     Anna lured Plaintiff by showing him examples over WhatsApp of how she was successfully earning high returns on her cryptocurrency trading methods.

34.     Anna claimed that her uncle was an analyst who gave her insight into when to trade.

35.     Anna represented to Plaintiff that she was using a trusted trading platform called "BankCEX".

36.     Anna assisted Plaintiff in downloading and accessing BankCEX which she

[5] https://www.reuters.com/investigates/special-report/fintech-crypto-fraud-thailand/
[6] The true identity of "Anna" remains unknown but, upon information and belief, she was, and may still be, an employee of ITECHNO, now doing business as TOPBET TECH CORP.

10

claimed was a legitimate decentralized trading exchange. She stated that BankCEX would be used as a trading platform with the purpose of making transactions; then when done, the assets would be transferred to Plaintiff's wallet for withdrawal.

37.    However, the application Anna provided to Plaintiff was in fact not a legitimate exchange website owned and operated by any exchange but was instead a fraudulent, duplicate website created to deceive individuals, including Plaintiff, into believing they were investing on a legitimate cryptocurrency exchange.

38.    The fraudulent trading platform, BankCEX, is no longer accessible.

39.    To further entice Plaintiff into believing she was a legitimate investor who only wanted to assist Plaintiff in becoming a successful cryptocurrency trader like her, on or about October 28, 2022, Anna had Plaintiff run a test where he transferred approximately $7,000.00 worth of cryptocurrency from his Crypto.com account into the fraudulent BankCEX platform. When Plaintiff was able to transfer this amount back to his digital wallet, he believed that Anna was a legitimate investor who wanted to help him learn how to invest cryptocurrency and, further, that the fraudulent website he had accessed was also legitimate.

40.    After familiarizing himself with the process of trading on the fraudulent mobile application recommended by Anna, and in reliance on the foregoing false and fraudulent misrepresentations, Plaintiff started to transfer cryptocurrency from his Crypto.com account, a legitimate third-party online platform for buying, selling, transferring, and storing cryptocurrency, to the fraudulent platform.

41. Defendants posted fraudulent returns on their fake website which made it appear that Plaintiff was making money on his trades.

42. As a result, Plaintiff continued to transfer cryptocurrency from his Crypto.com account to the fraudulent exchange. Because of the fraudulent representations contained on the fake BankCEX platform, and misrepresentations made by Anna, Plaintiff believed that he had made significant money from the investment.

43. Plaintiff was later told by Anna that the value of his cryptocurrency had grown significantly, which was reflected on the fraudulent BankCEX statements.

44. Plaintiff was happy with what he believed was a significant return on Plaintiff's investment. However, Plaintiff decided it was time to transfer all the cryptocurrency from BankCEX back to his Crypto.com account.

45. When Plaintiff attempted to transfer even a small portion of his cryptocurrency from the fraudulent application back to his Crypto.com, Plaintiff experienced issues and was unable to make transfers.

46. When Plaintiff questioned Anna about the transfer issues he was experiencing, Anna provided excuses and made additional false representations.

47. Plaintiff was told that, before Plaintiff could withdraw cryptocurrency, Plaintiff was required to transfer additional cryptocurrency to the fraudulent BankCEX platform for taxes and fees associated with his earnings ($115,000.00).

48. This is when Plaintiff realized he had been scammed. Plaintiff made numerous unsuccessful attempts to transfer the cryptocurrency from the fake exchange

back to his Crypto.com wallet.

**B. Plaintiff's Forensic Tracing of His Stolen Cryptocurrency**

49.    When a transaction is made on the blockchain it is assigned a "transaction hash" ("TXID"). A transaction hash is a unique string of characters that is given to every transaction that is verified and added to the blockchain. A TXID is used to uniquely identify a particular transaction. All on-chain transactions (depositing and withdrawing of funds) are assigned a unique TXID that can be found in transaction details.

50.    Within the time frame of October 28, 2022, and August 4, 2023, Plaintiff made eleven (11) transactions from his Crypto.com account to the fraudulent exchange. In total, Plaintiff transferred approximately 194,794 USD Coin (USDC), 113,958.21 Tether (USDT), and 2.54754 Ethereum (ETH) to the fraudulent exchange, which, at the time of these transactions, had a market value of approximately three hundred thirteen thousand seven hundred and seventy-four dollars ($313,774.00).

51.    TOPBET TECH and its employees, including the Defendant Employees, opened numerous cryptocurrency wallets that, upon information and belief, are owned or controlled by TOPBET TECH or its predecessor company, ITECHNO. These wallets are believed to the be used to launder Plaintiff's stolen cryptocurrencies through a network of wallets controlled by TOPBET TECH's employees, including the Defendant Employees, who participated either voluntarily or through force to perpetrate the fraud and laundering of Plaintiff's stolen proceeds through the blockchain until the stolen assets reached various cryptocurrency wallets believed to be owned and controlled by

TOPBET TECH or its co-conspirators, Doe Defendants 1-5.

## C. Laundering Network and Involvement of Defendants

52. The fraudulent scheme described above is consistent with the "pig butchering" (aka confidence scams) identified by the United States Department of Justice ("DOJ") and the United States Secret Service in the DOJ's Complaint, in which criminal actors use fraudulent platforms, social engineering, and complex laundering networks to steal and conceal victim assets.

53. In *United States of America v. Approximately 225,364,961 USDT*, Civil Action No. 25-cv-1907, the DOJ detailed an investigation wherein the United States Secret Service traced the proceeds of pig butchering scams through a network of at least 144 OKX exchange accounts and hundreds of intermediary wallets. In the Government's Complaint, it details how cryptocurrency stolen from victims of the same scam perpetrated against the Plaintiff were laundered through intermediary wallets until they were ultimately consolidated into seven wallets on the OKX platform which were seized by the DOJ and hold over $225 million USDT. *United States of America v. Approximately 225,364,961 USDT*, Civil Action No. 25-cv-1907, Verified Complaint for Forfeiture *In Rem* (Case No. 1:25-cv-01907, D.D.C.), Dkt No. 1 at ¶¶15, 45-240.

54. According to the DOJ's Complaint, "[l]aw enforcement analyzed the transactional activity associated with the 144 OKX Accounts and observed over 263,000 deposit transactions that totaled about *three billion dollars* in transactions. Notably, 98% of these transactions were conducted between November 2022 and

14

November 2023" *Id*. at ¶ 65 – **the same period of time when Plaintiff was scammed.**

55. Using the blockchain tracing tools, Plaintiff performed updated tracing of his stolen cryptocurrency. Plaintiff's updated tracing identified the network of wallets that were used by Defendants to steal and launder his cryptocurrency. Plaintiff compared his tracing to the network of wallets identified in the government above-referenced action, revealing that his stolen cryptocurrency was laundered through approximately 28 intermediary wallets and one OKX deposit wallet identified by the Government as one owned and controlled by ITECHNO, as shown below:

1. 0xd23281c16935fff3c8cf204c729dbb9b42a980d9 (25-CV-01907 at Dkt 1-2, 1-4, 1-6, 1-8, 1-13, 1-14, 1-15, 1-19, 1-21)

2. 0xecefebd25ec2737a8a8ee697142f2837f167f36c (*Id*. at Dkt 1-3, 1-5; "Unhosted Wallet")

3. 0x0e125b3a99bcbe89ea60a0b0f37d9e1b80ce9bce (*Id*. at Dkt 1-4, 1-22)

4. 0xf5b7556c640bfab7d201c6c62b56c1bd8ae13f62 (*Id*. at Dkt 1-5)

5. 0xce1c41305b9f13aaa8bdd312840ebbcdfde68a7f (*Id*. at Dkt 1-5, 1-6, 1-20)

6. 0xff1494d60e928f34a761ac6186ece0250a39c655 (*Id*. at Dkt 1-5, 1-31)

7. 0x1fa36606014c7f053670f34345ff265af5a6242d (*Id*. at Dkt 1-11)

8. 0x9dc11a61f145363b2ae4eebdc0ce50f07a3a0cf9 (*Id*. at Dkt 1-12)

9. 0xb327d8255423dbe187ef89253b9a75a257d3eaa5 (*Id.*)

10. 0x8da75136b6bf1704c01d2035c556aff28d15477f (*Id*)

11. 0x6d5be15f9aa170e207c043cdf8e0badbf2a48ed0 (*Id.***)**

12. 0xa55c9b6c3cd580eff754b9d1f9937786e877ab99 (*Id.* at 1-13, 1-15)

13. 0x083a75b66168310d6690ea5603b7358cd57739f8 (*Id.*)

14. 0xd4ac8947b7a1220042d86c10a82a9ac891e99d46 (*Id.*)

15. 0x3196682ead5ce55f148f3ea4665185cca203c78a (*Id.*)

16. 0xb58981424df1ba6fcae4db3a489641f0d7430d9c (*Id.* at -1-14)

17. 0x3303ff625a9a2c017b290c156987d9afeb4e30e1 (*Id.* at1-15)

18. 0x90e32d0c29d4d88849bbf014c0289efcf8294a74 (*Id.*)

19. 0xe22f403a5de50aa3086a5366044bc4e9f9a9f2fa (*Id.*)

20. 0xef6c21151b2d20b8db463c120e3e2f4dcc63ee3b (*Id.*)

21. 0x8260e0070c6db81ed8349264c41ff3399d4d74c5 (*Id.*)

22. 0x978361ed5dc2042b4fbc8c39c4aa9d94e2af81a5 (*Id.* at 1-20)

23. 0x7e60e4a1e616667caccd1ffa69c446346561b798 (*Id.*)

24. 0xb06843fbb7ae602e29ae8b1113af1e1a790ebc43 (*Id.*)

25. 0x5900e990c1d0dbaac8c6b9d5ea1ca7086b1470b6 (*Id.*)

26. 0x0554e2a3fb70754c7bf012598c2a723c0e0feff3 (*Id.* at 1-21)

27. 0x8b924b87abbc19e98ab701056ef1cc896f680a34 (*Id.* at 1-22)

28. 0x77729b7a2212de585b81ba7f0e636456ae2f248e (*Id.*)

29. 0x7f2de657ab21f269ea8e37eea1a9245af6d2e669 (*Id.*at 1-20, "OKX Deposit Wallet")

16

56.     These same wallets were also used to launder the criminal proceeds that were ultimately seized by the United States.

57.     Thus, Plaintiff was scammed by the same type of scam, during the same relevant period, described in the Government's Complaint of November 2022 through November 2023, and his stolen cryptocurrency was laundered through some of the same wallets that were also used by the perpetrators in the Government's forfeiture action, including to an OKX deposit wallet known to be owned and controlled by ITECHNO.

58.     Upon further investigation, it has become clear that ITECHNO, who was identified as the scam actors in the Government's forfeiture action, continues to operate with impunity on the same floors and within the same building as it has for years but, in an attempt to conceal its location and ongoing scam operation, simply changed its name to TOPBET TECH CORP. See Ex. A.

59.     The government's action identifies ITECHNO (now TOPBET TECH) as a key participant in the scam and laundering operation.

60.     In the government's Complaint, "[a]ll 144 OKX Accounts are believed to be controlled by a group of cryptocurrency confidence scam actors and/or their money laundering co-conspirators." Civil Action No. 25-cv-1907 at ¶ 47.  According to the Government, many of the subject OKX Accounts were opened by employees of ITECHNO (now TOPBET TECH). *See e.g., Id.* at ¶¶ 45-66.  ITECHNO operated out of a scam compound in the Philippines, likely employing forced labor to perpetrate

17

cryptocurrency pig butchering scams and launder victim funds. *Id*.

61.  The movement of Plaintiff's stolen assets through some of the same intermediary wallets identified by the United States to launder the assets to wallets owned or controlled by TOPBET TECH/ITECHNO which, per the Government's Complaint, were eventually transferred to the seven wallets owned by TOPBET TECH's co-conspirators and provides strong evidence of TOPBET TECH/ITECHNO's involvement in the theft and laundering of Plaintiff's cryptocurrency.

## COUNT I
## RACKETERING IN VIOLATION OF 18 U.S.C. § 1964

62.  Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

63.  At all relevant times, Defendant TOPBET TECH, the Defendant Employees, and their co-conspirators Does 1-5, constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4), associated in fact for the common purpose of executing a global cryptocurrency fraud and money laundering scheme.

64.  The operation of ITECHNO/TOPBET TECH, individually and through its alleged businesses, including their fraudulent cryptocurrency trading and use of online gambling platforms to launder criminal proceeds, constitutes a racketeering operation.

65.  Defendants directed and coordinated with each other ("RICO Enterprise," or "Enterprise") within the meaning of 18 U.S.C. § 1964(4), which Enterprise was engaged in, or the affairs of which affected, interstate and foreign commerce.

66.  Defendants were also members of the RICO Enterprise, as each was a

18

distinct person, separate and apart, from each of the RICO Enterprise members together.

67. Defendants, individually and collectively, conducted or participated, directly or indirectly, in the conduct of the affairs of the RICO Enterprise through a pattern of racketeering activity, as described above.

68. Each person's participation was effective partly because each mimicked an actual on-going business (including the fraudulent platform) with a presence in the marketplace: the United States and indeed worldwide. Upon information and belief, TOPBET TECH, its Defendant Employees, and Doe Defendants 1-5 used an online gambling business, which had a presence within the marketplace, to further launder the illicit proceeds into the worldwide economy.

69. As co-conspirators, the unlawful conduct of each member of the RICO Enterprise is attributed to every member.

70. The pattern of racketeering activity included, but was not limited to, multiple acts of wire fraud (18 U.S.C. § 1343), conspiracy to commit wire fraud (18 U.S.C. § 1349), money laundering (18 U.S.C. § 1956(a)(1)(B)(i)), and conspiracy to commit money laundering (18 U.S.C. § 1956(h)), all in violation of 18 U.S.C. § 1962(c).

71. The predicate acts set forth in this Amended Complaint include defrauding Plaintiff through domestic and international communication including: through social media platforms, emails, encrypted communication platforms and telephone, then laundering the criminal proceeds through the blockchain and ultimately into an online gambling business operation.

72. The predicate acts set forth in this Complaint are related, in that they have the same or similar purposes, results, participants, and methods of commission, and are otherwise interrelated by distinguishing characteristics and are not isolated events. The related criminal schemes set forth in this Amended Complaint constitutes a "pattern or patterns of racketeering activity" as defined in 18 U.S.C. § 1961(5).

73. The Defendants engaged in two or more predicated acts of racketeering within a period of ten years and committed at least one such act after October 15, 1970.

74. The information that would establish further predicate acts and further acts of racketeering is solely within the control of Defendants. Plaintiff requires discovery to ferret out the further extent of predicate acts and further acts of racketeering, including the identity of similarly situated defrauded victims and the scope of the systematic fraud.

75. Defendants have received income derived, directly or indirectly, from a pattern of racketeering activity and used or invested, directly or indirectly, part of such income, or the proceeds of such income, in acquisition of an interest in, or in the establishment or operation of, the RICO Enterprise, an enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce in violation of 18 U.S.C. § 1962(a).

76. The RICO Enterprise's activities affected interstate and foreign commerce, as the scheme targeted victims in the United States (including California), utilized U.S.-based and foreign cryptocurrency exchanges, and involved the movement of assets

across national boundaries.

77.    As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(c), Plaintiff has suffered damages.

**WHEREFORE,** Plaintiff demands that judgment be entered against each Defendant, jointly and severally, as follows:

    (a)    damages;

    (b)    statutory trebled damages pursuant to 18 U.S.C. § 1964(c);

    (c)    punitive damages;

    (d)    costs, including reasonable attorney's fees, pursuant to 18 U.S.C. § 1964(c);

    (e)    costs;

    (f)    interest; and

    (g)    such other and further relief as this Court deems just and proper.

## COUNT II
## FRAUD

78.    Beginning on or about September 2022, the Defendant Employees, acting individually and in concert with TOPBET TECH/ITECHNO, knowingly and intentionally engaged in a scheme to defraud Plaintiff.

79.    The fraudulent scheme was initiated when "Anna" contacted Plaintiff via text message and subsequently provided her WhatsApp contact number.   Anna represented herself as someone who was successfully earning high returns on her cryptocurrency and as someone who could connect Plaintiff to her uncle to assist Plaintiff in becoming a successful trader like her.

21

80. Through September and October 2022, Anna, through repeated communications via WhatsApp, induced Plaintiff to invest in cryptocurrency by making the following false and material representations:

    a. That she was a successful cryptocurrency trader with access to inside information and a network of professional trading experts, including her "uncle";

    b. That Plaintiff's investments would be managed through a legitimate decentralized trading exchange ("BankCEX");

    c. That Plaintiff's funds would be safe, secure, and would generate substantial profits with minimal risk; and

    d. That Anna and her associates had previously made and withdrawn large profits using the same methods and platforms.

81. In reliance on these representations, Plaintiff ran a test transfer where he then sent approximately $7,000.00 worth of cryptocurrency from his Crypto.com account into the fraudulent BankCEX platform. When Plaintiff was able to transfer this amount back to his digital wallet, he believed that Anna was a legitimate investor who wanted to help him learn how to invest in cryptocurrency and, further, that the fraudulent website he had accessed was also legitimate.

82. After Plaintiff's investments appeared to generate significant profits through BankCEX and attempted to transfer his funds back to his account, Anna

representatives falsely informed Plaintiff that he could not withdraw his funds unless he first made a large deposit to pay "taxes" or "fees" on the purported profits.

83.     These representations were knowingly false when made. The BankCEX platform was a sham, the profits displayed were fictitious, and the demand for tax payments was a further attempt to extract additional funds from Plaintiff.

84.     TOPBET TECH/ITECHNO, including the Defendant Employees and Doe Defendants 1-5, as participants in the laundering network identified by the United States Department of Justice, knowingly received, concealed, and laundered Plaintiff's stolen assets through wallets and accounts under their control, as detailed in the DOJ's Complaint.

85.     The specific acts of fraud include, but are not limited to:

- Anna's initial and ongoing communications with Plaintiff (September – October 2022, including the provision of false personal and financial information;

- The creation and operation of the fraudulent BankCEX platform;

- The orchestration of wire transfers and cryptocurrency purchases under false pretenses;

- The fabrication of account balances and profits to induce further investment;

- The demand for a large crypto deposit to pay "taxes" as a condition for withdrawal; and

23

- The laundering of Plaintiff's stolen assets through wallets controlled by ITECHNO.

86.    Plaintiff reasonably and justifiably relied on Defendants' false statements and omissions, which were made with the intent to induce Plaintiff's reliance and to deprive Plaintiff of his assets.

87.    As a direct and proximate result of Defendants' fraudulent conduct, Plaintiff suffered damages including the loss of at least $313,774.00 in cryptocurrency, loss of use of those assets, and consequential damages.

88.    Plaintiff is entitled to recover actual damages, punitive damages, interest, costs, and such other relief as the Court deems just and proper.

**WHEREFORE**, Plaintiff demands that judgment be entered against all Defendants, jointly and severally, for damages, interest, costs, and such other and further relief as this Court deems just and proper.

**COUNT III**
**CONVERSION**

89.  Through fraudulent misrepresentations, Defendants convinced Plaintiff to invest his money into cryptocurrency.

90.    Defendants then convinced Plaintiff to transfer his cryptocurrency to fake exchanges owned and operated by Defendants.

91.    After Plaintiff transferred his cryptocurrency assets to the fake platform, Defendants then transferred Plaintiff's cryptocurrency to cryptocurrency addresses

owned or controlled by ITECHNO/TOPBET TECH, and then to OKX wallets owned and controlled by its co-conspirator.

92. Plaintiff owned and had a right to possess the cryptocurrency.

93. Defendants substantially interfered with the cryptocurrency by knowingly or intentionally misappropriating the funds and taking possession of the cryptocurrency, preventing Plaintiff from having access to the cryptocurrency.

94. Defendants have refused to return Plaintiff's cryptocurrency after Plaintiff demanded its return on multiple occasions.

95. Defendants did not have Plaintiff's consent to convert Plaintiff's funds to their own use or to the use of others not entitled thereto and have exercised dominion and control over the funds to Plaintiff's exclusion and detriment.

96. Defendant's conduct was a substantial factor in causing Plaintiff harm.

97. As a direct and proximate result of Defendants' conversion and conduct, Plaintiff has suffered damages.

**WHEREFORE**, Plaintiff demands that judgment be entered against all Defendants, jointly and severally, for damages, interest, costs, and such other and further relief as this Court deems just and proper.

**COUNT IV**
**UNJUST ENRICHMENT**

98. Defendants received a direct benefit at Plaintiff's expense by fraudulently convincing Plaintiff to transfer valuable cryptocurrency that Defendants converted from

Plaintiff. Defendants have knowledge of the benefit Plaintiff conferred upon them and have retained such benefit.

99.   The circumstances under which Plaintiff conferred and Defendants accepted, render Defendants' retention of the benefits inequitable.

100.   Equity required that Defendants return to Plaintiff the benefits he conferred upon Defendants.

**WHEREFORE**, Plaintiff demands that judgment be entered against all Defendants, jointly and severally, for damages, interest, costs, and such other further relief as this Court deems just and proper.

**COUNT V**
**<u>CONSPIRACY</u>**

101.   The Defendants conspired and confederated with each other to commit, and committed, Fraud; Conversion; and Unjust Enrichment.

102.   Plaintiff was harmed by Defendant's wrongful acts of conversion, RICO violations, and unjust enrichment. Relying on the false statements made by the Defendant Employees of ITECHNO/TOPBET TECH and its co-conspirators, including that they were experts in cryptocurrency investments, Plaintiff transferred his cryptocurrency assets to a fake cryptocurrency platform which were actually addresses owned or controlled by Defendants.

103.   Defendants conspired with others via the fraudulent website and encrypted communication platforms where they communicated with Plaintiff. Defendants are the

owners or exercise control over the cryptocurrency deposit addresses where Plaintiff's stolen cryptocurrency was transferred.

104.   As a result, Plaintiff has suffered damages as a direct and proximate result of Defendants' conspiracy.

105.   Defendants are responsible for the harm caused by such wrongful acts because they each were part of a conspiracy to commit such violations.

106.   Defendants each entered into an agreement to commit such wrongful acts.

107.   Defendants were aware that each co-conspirator planned to commit such wrongful acts.

108.   Defendants each agree with one another and intended that the wrongful acts be committed.

**WHEREFORE**, Plaintiff demands that judgment be entered against all Defendants, jointly and severally, for damages, interest, costs, and such other and further relief as this Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff demand trial by jury on all issues so triable.

Dated: June 26, 2026

       Respectfully Submitted,

           By:   */s/ Daniel J. Thornburgh*
              Daniel J. Thornburgh, Esq.
              Fla. Bar No. 0042661
              AYLSTOCK, WITKIN,

27

KREIS & OVERHOLTZ, PLC
17 East Main Street, Suite 200
Pensacola, FL 32502
Telephone: 850-202-1010
Fax: 850-916-7449
dthornburgh@awkolaw.com

-and-

Kiley L. Grombacher
Bradley Grombacher, LLP
31365 Oak Crest Drive, Suite 240
Westlake Village, CA  91361
Kgrombacher@bradleygrombacher.com
Telephone:  805-270-7100
Facsimile:  805-270-7589

*Attorneys for Plaintiff*